UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KHALED AL HASSEN, | ) Case No. CV 09-01106 DMG (MANx) |
| Plaintiff, | ) **ORDER RE DEFENDANTS' MOTION TO DISMISS** |
| v. | ) |
| SHEIKH KHALIFA BIN ZAYED AL NAHYAN, et al., | ) |
| Defendants. | ) |

This matter is before the Court on Defendants' Motion to Dismiss.  A hearing was held on August 30, 2010.  Having duly considered the respective positions of the parties, as presented in their briefs and at oral argument, the Court now renders its decision.  For the reasons set forth below, Defendants' Motion is GRANTED in part and DENIED in part.

## I.

## PROCEDURAL HISTORY

On February 13, 2009, Plaintiff Khaled Al Hassen filed the operative Complaint against Defendants Sheikh Khalifa Bin Zayed Al Nahyan ("Sheikh Khalifa"), Sheikh Mohamed Bin Zayed Al Nahyan ("Sheikh Mohamed"), General Saeed Hilal Abdullah Al Darmaki ("General Saeed Hilal"), and Doe defendants 1 through 10.  Plaintiff alleges that

Defendants, under the actual or apparent authority of the United Arab Emirates ("UAE") government, abducted, imprisoned, and brutally tortured him, a United States citizen, for nearly two years.  (Compl. ¶ 1.)[1]  Plaintiff asserts causes of action for torture under the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, historical and statutory notes), assault and battery, false arrest and imprisonment, intentional infliction of emotional distress, and civil conspiracy.

On November 6, 2009, the Court ordered Plaintiff to show cause why this action should not be dismissed for lack of prosecution.  Plaintiff filed a response on November 16, 2009.   In the response, Plaintiff informed the Court of difficulties that he had encountered in attempting to serve process on the known defendants.  Accordingly, the Court ordered Plaintiff to file by January 25, 2010 either (1) a valid proof of service for each defendant; or (2) a motion for leave to serve Defendants by publication.  On January 25, 2010, Plaintiff filed a motion for leave to effect service of process by alternative methods.  The Court granted this motion on March 3, 2010.

Defendants filed the Motion to Dismiss on May 14, 2010.  Plaintiff filed his Opposition on June 28, 2010.  On July 12, 2010, Defendants filed their Reply.  The United States, not a party to this suit, filed a Suggestion of Immunity for Sheikh Khalifa on July 26, 2010.

## II.

## ALLEGATIONS OF THE COMPLAINT

On a motion to dismiss for lack of personal jurisdiction where, as here, the court does not hold an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdiction.   Uncontroverted allegations in the complaint are deemed true and conflicts between the facts in the parties' affidavits are resolved in the plaintiff's favor.

---

[1] Plaintiff states inconsistently that his abduction occurred on January 11, 1984 (Compl. ¶ 1) and January 11, 1985 (*id*. ¶ 14).  It appears from the record that 1984 is the correct year.

A court must construe "any evidentiary materials submitted on the motion . . . in the light most favorable to the plaintiff[s] and all doubts are resolved in [their] favor." *Ochoa v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182, 1187 (9th Cir. 2002) (brackets in original; internal quotation marks omitted) (quoting *Metro. Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1064 n.1 (9th Cir. 1990)).   Thus, solely for purposes of evaluating Defendants' Motion, the Court assumes the following factual allegations, taken from the Complaint, to be true:

Plaintiff Khaled Al Hassen is a United States citizen naturalized in 1975.  (Compl. ¶ 9.)  Defendant Sheikh Khalifa is a native, citizen, and resident of the UAE who at all relevant times was the head of both the UAE Army and the UAE State Security Agency. (*Id*. ¶ 10.)  Defendant Sheikh Mohamed is a native, citizen, and resident of the UAE who was a major with the UAE Air Force.  (*Id*. ¶ 11.)  Defendant General Saeed Hilal is a native, citizen, and resident of the UAE who was the UAE state Minister for Interior Affairs and commander of the detention facility where Plaintiff was held.  (*Id*. ¶ 12.)

The UAE is a federation of seven semi-autonomous emirates, with an estimated resident population of approximately 4.5 million, of which only 21% are citizens.  The seven emirate rulers constitute the Federal Supreme Council, the UAE's highest legislative and executive body, of which Defendant Sheikh Khalifa, ruler of the Abu Dhabi Emirate, has been appointed President and head of state.  The UAE has a federal Ministry of Interior that oversees the Police General Directorates in each of the seven emirates.  Each emirate, however, maintains its own police force and supervises its own police stations.  The UAE also has a federal Ministry of Defense comprising the UAE Army, Navy, Marines, Coast Guards, Air Force, and Air Defense Force.  (*Id*. ¶ 18.)  The UAE constitution prohibits torture and arbitrary arrest or detention.  (*Id*. ¶ 19.)

Plaintiff entered into a contract with International Trading Circle ("ITC"), a UAE consulting firm.  ITC's owner and operator, Sheikh Shaya Bin Ahmed Al Hamed, was a member of Abu Dhabi's royal family and Defendants' rival.  Under the contract between

Plaintiff and ITC, Plaintiff would serve as ITC's manager and hold responsibility for facilitating business development between Abu Dhabi and Western industry.  (*Id.* ¶ 9.)

On January 11, 1984 at approximately 6:00 p.m., Defendants abducted or caused the abduction of Plaintiff in Abu Dhabi while Plaintiff was under contract with ITC and acting in the course and scope of his employment.  The abduction was extrajudicial in nature and was without any basis under the laws of the UAE.  (*Id.* ¶¶ 1, 14.)

Defendants, directly or through surrogates, immediately confined Plaintiff in a windowless cell and subjected Plaintiff to continuous interrogation and torture in violation of the law of nations, the laws of the UAE, and the laws of the United States. Plaintiff's detention lasted until November 4, 1985, when Defendants released him.  (*Id.* ¶ 15.)  Defendants Sheikh Mohamed and General Saeed Hilal were personally present during Plaintiff's detention and torture and personally participated in it.  In addition, both Defendants Sheikh Mohamed and General Saeed Hilal approved, authorized, directed, supervised, controlled, ratified and consented to Plaintiff's ongoing torture by their subordinates, who were also personally involved in Plaintiffs detention and torture.  (*Id.* ¶ 24.)  Throughout the period of Plaintiff's detention and torture and, in particular, at the time of his release, Defendants informed Plaintiff that their agents in the United States and throughout the rest of the world were prepared to hunt down and murder Plaintiff and his family if Plaintiff disclosed any details about his abduction and detention, including Defendants' torturous acts.  (*Id.* ¶ 26.)

From the night of Plaintiff's abduction until his release, Defendants, their subordinates, and co-conspirators held Plaintiff in their custody and/or physical control. They intended to inflict severe pain and suffering on Plaintiff by purposefully and systematically subjecting him to severe mental and physical pain and suffering. Defendants repeatedly beat Plaintiff, especially around the area of the head.  Plaintiff had no choice but to endure listening to the screams and sounds of the torture of other prisoners, who were held in solitary confinement in adjoining cells.  The abuse has

caused Plaintiff lasting and debilitating emotional distress and physical deficit.  Plaintiff is haunted by the memory of his savage and inhuman torture.  (*Id.* ¶ 31.)

On several occasions, Defendants threatened to murder Plaintiff or intentionally harm his family.  In September 1984, Defendant General Saeed Hilal forcibly placed a machine gun in Plaintiff's mouth and threatened to kill Plaintiff if he discussed the conditions of his confinement.  On other occasions, Defendants informed Plaintiff that he could leave Abu Dhabi alive only if he first confessed to committing certain acts purportedly contrary to the state interest of the UAE.  (*Id.* ¶ 32.)

Throughout the duration of Plaintiff's confinement, Defendants, either directly or through their agents, deprived Plaintiff of sleep for extended periods of time by controlling and regulating the lighting in Plaintiff's seven-by-ten-foot cell.  (*Id.* ¶ 33.) Approximately two months after Plaintiff's abduction and initial confinement, Defendants sealed the sole air conditioning vent in Plaintiff's cell.  Temperatures in the cell subsequently climbed substantially, particularly during the summer months, causing Plaintiff to suffer acute pain in his joints.  (*Id.* ¶ 34.)

Defendants repeatedly blindfolded and handcuffed Plaintiff, in some instances continuously for up to several days at a time.  Defendants would force Plaintiff to stand handcuffed for several hours.  At times, Plaintiff was handcuffed and dragged around the hallway outside his cell.  (*Id.* ¶ 35.)  While Plaintiff was blindfolded and handcuffed, Defendants frequently and repeatedly would bind Plaintiff's feet and legs with rope and then hang Plaintiff upside down for long periods of time.  (*Id.* ¶ 36.)

Throughout much of Plaintiff's confinement, Defendants did not give Plaintiff free access to water or to restroom facilities.  (*Id.* ¶ 39.)  Defendants regularly forced Plaintiff to ingest strange-tasting liquids that induced severe pain and hallucinations.  (*Id.* ¶ 37.) Throughout Plaintiff's confinement, Defendants stripped him naked and, from time to time, touched and otherwise manipulated Plaintiff's genitals, intoning that such humiliation "would be only the beginning" of the trauma that Defendants were prepared to perpetrate against Plaintiff.  On at least one occasion, Defendants expressly threatened

to amputate Plaintiff's genitals if he "kept lying," *i.e.*, refused to acquiesce in Defendants' demands that he confess to the commission of certain acts contrary to the UAE's state interest. (*Id.* ¶ 38.)

As a condition of release, Defendants forced Plaintiff to sign a statement admitting that he committed certain acts contrary to the UAE's state interest. The UAE government never indicted Plaintiff or charged him with the commission of any crime or other offense. Plaintiff was never afforded access to, or subject to process of, a regularly constituted judicial tribunal. Defendants coerced Plaintiff into signing the statement under severe duress. (*Id.* ¶¶ 16, 40.)

Defendants acted in concert to plan, carry out, and cover up the torture perpetrated against Plaintiff. (*Id.* ¶ 17.) Their conduct was extrajudicial in nature and not committed in their capacities as government officials but was inflicted under actual or apparent authority or color of law of the government of the UAE. (*Id.* ¶¶ 20-22, 25.)

Fearing ruthless reprisal and retribution directed against both Plaintiff and his family members, Plaintiff could not seek redress—either in the UAE or the United States—for the wrongs perpetrated against him. This fear lasted for several decades following his release from UAE confinement. Plaintiff only recently came to believe that Defendants would most likely not attempt to harm Plaintiff in retribution for filing a civil action. Although Defendants remain in power at the highest levels of UAE government, recent political events have solidified the UAE's desire to maintain favorable relations with the United States. The UAE would most likely not employ its agents to harm an American citizen residing in the United States. (*Id.* ¶ 27.)

Several factors prevent Plaintiff from proceeding civilly against Defendants in the UAE. First, Defendants still occupy positions of immense power and influence. Defendant Sheikh Khalifa is the current ruler of the UAE; Defendant Sheikh Mohamed is Crown Prince and the *de facto* head of the UAE armed forces; and Defendant General Saeed Hilal is a current advisor to the President. In addition, the UAE government has shown no intent to proceed against Defendants for their involvement in the human rights

1  crimes allegedly committed against Plaintiff.   Furthermore, members of the UAE
2  judiciary serve at the pleasure of the country's executive, which includes Defendants as
3  well as their associates and relatives.  Finally, litigation in the UAE would cause Plaintiff
4  extreme concern for his own safety as well as that of his family and loved ones who
5  remain in the UAE.  (*Id.* ¶¶ 28-29.)

6       Plaintiff asserts five causes of action:  (1) torture in violation of the TVPA; (2)
7  assault and battery; (3) false arrest and false imprisonment; (4) intentional infliction of
8  emotional distress; and (5) civil conspiracy.

9  **III.**

10  **JURISDICTION**

11  **A.**   **The Court Has Subject Matter Jurisdiction Because The Foreign Sovereign**
12        **Immunities Act Does Not Apply To Individual Defendants**

13       In their Motion, Defendants argue that the Foreign Sovereign Immunities Act
14  ("FSIA"), 28 U.S.C. § 1604 *et seq.*, precludes the Court from presiding over this case
15  because it shields foreign states and their instrumentalities and agents from jurisdiction in
16  United States courts.  (Mot. at 10-12.)  After Defendants filed their Motion, the Supreme
17  Court held in *Samantar v. Yousuf*, __ U.S. __, 130 S.Ct. 2278, 2292, __ L.Ed.2d __
18  (2010), that the FSIA applies only to foreign states, not foreign officials.  As Defendants
19  recognize in their Notice of Supplemental Authority [Doc. #34], *Samantar* thus
20  forecloses their argument that this Court lacks subject matter jurisdiction.

21  **B.**   **The Court Lacks Personal Jurisdiction Over Defendant Sheikh Khalifa—But**
22        **Not Defendant Sheikh Mohamed—As A Recognized Head Of State**

23       Defendants Sheikh Khalifa and Sheikh Mohamed assert that the Court cannot
24  exercise personal jurisdiction over them because they are heads of state recognized by the
25  United States government.  (Mot. at 9-10.)  The State Department has recognized and
26  allowed the immunity of Defendant Sheikh Khalifa from this lawsuit.  (Suggestion of
27  Immunity ¶ 2.)  According to the Attorney General, "[t]he Executive Branch . . . has
28  determined that permitting this action to proceed against Sheikh Khalifa as a head of state

-7-

would be incompatible with the United States' foreign policy interests." (Suggestion of Immunity ¶ 1.)

When the State Department grants a foreign sovereign's request for a suggestion of immunity, the district court surrenders its jurisdiction. Absent such recognition by the State Department, a district court has the authority to decide for itself whether the defendant has satisfied the prerequisites for immunity.[2] *Samantar*, 130 S.Ct. at 2284-85 & n.6. Because the State Department has granted Defendant Sheikh Khalifa's request, he is entitled to immunity. *See Ye v. Zemin*, 383 F.3d 620, 625 (7th Cir. 2004) ("[T]he Executive Branch's suggestion of immunity is conclusive and not subject to judicial inquiry." (citing *Ex Parte Republic of Peru*, 318 U.S. 578, 589, 63 S.Ct. 793, 87 L.Ed. 1014 (1943)); *Spacil v. Crowe*, 489 F.2d 614, 617 (5th Cir. 1974) ("For more than 160 years American courts have consistently applied the doctrine of sovereign immunity when requested to do so by the executive branch. Moreover, they have done so with no further review of the executive's determination." (footnote omitted)).

The Court must next determine whether Defendant Sheikh Mohamed is also entitled to immunity as a recognized head of state. A foreign state's common law immunity from suit in domestic courts extends absolutely to, *inter alia*, (1) its head of state; (2) its head of government; (3) its foreign minister; and (4) any person designated by the head of state, head of government, or foreign minister as a member of his or her official party. Restatement (Second) of Foreign Relations Law of the United States § 66 (1965) [hereinafter Restatement]; *see also Samantar*, 130 S.Ct. at 2290 (describing the Restatement as "instructive" as to the "scope of an official's immunity at common law").

The UAE's head of state is Defendant Sheikh Khalifa; its head of government is its prime minister, Sheikh Mohammed bin Rashid Al Maktoum; and its foreign minister is Sheikh Abdullah bin Zayed Al Nahyan. (Defs.' Request for Judicial Notice ("RJN"), Ex.

---

[2] At the hearing on Defendants' Motion to Dismiss, Plaintiff conceded that Defendant Sheikh Khalifa is entitled to immunity based on the Government's suggestion of immunity.

A at 6.)   Because Defendant Sheikh Mohamed is not one of these three individuals or designated as a member of their official parties, he is not entitled to absolute immunity as a head of state.

Although state immunity may apply to "any other public minister, official, or agent of the state," such an official only receives immunity "with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state."   Restatement § 66(f); *see also id.* cmt. b ("Public ministers, officials, or agents of a state . . . do not have immunity from personal liability even for acts carried out in their official capacity, unless the effect of exercising jurisdiction would be to enforce a rule against the foreign state or unless they have one of the specialized immunities . . . .").

> Immunity is extended to an individual only when acting *on behalf* of the state because actions against those individuals are the practical equivalent of a suit against the sovereign directly.   A lawsuit against a foreign official acting outside the scope of his authority does not implicate any of the foreign diplomatic concerns involved in bringing suit against another government in United States courts.

*In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1472 (9th Cir. 1994) (internal quotation marks and citation omitted).

Plaintiff alleges that Defendants acted outside the scope of their official positions. (Compl. ¶¶ 10-12.)   Therefore, state immunity does not apply to Defendant Sheikh Mohamed with respect to the actions at issue in this lawsuit.

Defendants rely on several cases that granted immunity where the government requested it.   *See Estate of Domingo v. Republic of Philippines*, 808 F.2d 1349, 1350 (9th Cir. 1987); *Howland v. Resteiner*, No. 07-CV-2332, 2007 WL 4299176, at *1 (E.D.N.Y. Dec. 5, 2007); *Matar v. Dichter*, 500 F. Supp. 2d 284, 287 (S.D.N.Y. 2007), *abrogated by Samantar*; *Kilroy v. Windsor*, No. C 78-291, 1978 U.S. Dist. LEXIS 20419, at *1-2 (N.D. Ohio Dec. 7, 1978).   This, however, is not a controversial point.   As discussed,

1    *supra*, the Court acknowledges Defendant Sheikh Khalifa's immunity as a result of the

2    State Department's suggestion.  The State Department has not requested immunity for

3    Defendant Sheikh Mohamed notwithstanding that all three defendants sought immunity

4    at the same time.  (*See* Begakis Decl., Ex. A.)  The Court finds no legal basis to extend

5    absolute immunity to either the head of a state's armed forces or to the head of a state's

6    political subdivision.[3]  Defendant Sheikh Mohamed is thus not entitled to immunity.

7    **C.    The Court Has Personal Jurisdiction Over Defendants Sheikh Mohamed And**

8         **General Saeed Hilal**

9         Defendants next argue that this Court cannot exercise personal jurisdiction over

10   them.  The plaintiff bears the burden of showing that jurisdiction is appropriate.  *Love v.*

11   *Associated Newspapers, Ltd.*, 611 F.3d 601, 608 (9th Cir. 2010).  Where, as here, no

12   federal statute governs personal jurisdiction, a district court applies the law of the state in

13   which the court sits.  *See* Fed. R. Civ. P. 4(k)(1); *Schwarzenegger v. Fred Martin Motor*

14   *Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  Because California's long-arm jurisdictional

15   statute, Cal. Civ. Proc. Code § 410.10, is coextensive with federal due process

16   requirements, the jurisdictional analysis under either state or federal law is the same.

17   *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th

18   Cir. 2006) (*en banc*).

19        Consistent with due process, a court may exercise personal jurisdiction over a

20   defendant "only if he or she has 'certain minimum contacts' with the relevant forum

21   'such that the maintenance of the suit does not offend traditional notions of fair play and

22   substantial justice.'"  *Id*. (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66

23   S.Ct. 154, 90 L.Ed. 95 (1945)).  A forum state may exercise two forms of jurisdiction

24   over a nonresident defendant:  general jurisdiction and specific jurisdiction.  *Boschetto v.*

25   _____

26        [3]  In their Reply, Defendants suggest that the Court may wish to stay this case pending a
     determination by the State Department whether Defendant Sheikh Mohamed is entitled to immunity as
27   the Crown Prince and Ruler of Abu Dhabi.  (Reply at 7 n.2.)  The Court finds no reason to stay the case
     at this time.   Should subsequent State Department action warrant reconsideration of this issue,
28   Defendant Sheikh Mohamed may file an appropriate motion at that time.

*Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008).  General jurisdiction is appropriate when "a defendant's contacts with a forum are so substantial, continuous, and systematic that the defendant can be deemed to be 'present' in that forum for all purposes." *Menken v. Emm*, 503 F.3d 1050, 1056-57 (9th Cir. 2007).  Specific jurisdiction, in contrast, is "based on the relationship between the defendant's forum contacts and plaintiff's claims." *Id.* at 1057.

Plaintiff does not contest Defendants' assertion that the Court lacks general jurisdiction over them and therefore the Court does not address the issue.[4]  Courts in the Ninth Circuit follow a three-part test to determine whether they may appropriately exercise specific jurisdiction over a nonresident defendant:  (1) the defendant must (a) "purposefully direct his activities or consummate some transaction with the forum or resident thereof"; or (b) "perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws"; (2) the claim must arise out of or relate to the defendant's forum-related activities; and (3) "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."  *Boschetto*, 539 F.3d at 1016 (quoting *Schwarzenegger*, 374 F.3d at 802).  The plaintiff bears the burden of establishing the first two prongs.  If the plaintiff meets this burden, the defendant "must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (citation omitted).

As an initial matter, the parties dispute whether the relevant forum for the due process analysis is California, as Defendants contend, or the entire United States, as Plaintiff maintains.  In advocating for a nationwide forum, Plaintiff invokes Federal Rule of Civil Procedure 4(k)(2), commonly described as "the federal long-arm statute."

---

[4] Courts have been "reluctant to exercise general jurisdiction" because the Ninth Circuit has not "developed a precise checklist or articulated a definitive litany of factors" to guide district courts in their analysis and the Supreme Court has upheld general jurisdiction only once. *See Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1172 (9th Cir. 2006).

*Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006).  A plaintiff wishing to utilize Rule 4(k)(2) as a federal long-arm statute must prove three factors:  (1) the claim against the defendant arises under federal law; (2) the defendant is not subject to the personal jurisdiction of any state court of general jurisdiction; and (3) the federal court's exercise of personal jurisdiction comports with due process.  *Id*.

Plaintiff establishes the first factor because his TVPA cause of action arises under federal law.[5]  With respect to the second factor, the defendant resisting application of Rule 4(k)(2) must demonstrate its susceptibility to jurisdiction in some other state, *Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450, 461-62 (9th Cir. 2007), which Defendants here decline to do (*see* Reply at 2 (assuming that Plaintiff has "satisfactorily pled" this factor)).  The due process analysis pursuant to the third Rule 4(k)(2) factor is identical to the analysis where the forum is California, except that the relevant forum under Rule 4(k)(2) is the entire United States.  *Pebble Beach*, 453 F.3d at 1159.  Because, as discussed *infra*, the Court finds that a United States forum comports with due process, the application of Rule 4(k)(2) is appropriate.

**1.    Purposeful Direction**

Under the "purposeful direction" or "effects" test,[6] which Plaintiff appears to argue the Court should apply, a defendant has the requisite minimum contacts when "(1) the defendant committed an intentional act; (2) the act was expressly aimed at the forum state; and (3) the act caused harm that the defendant knew was likely to be suffered in the forum state."  *Love*, 611 F.3d at 609 (citing *Yahoo!*, 433 F.3d. at 1206).  Where the

---

[5] If the Court has personal jurisdiction over Defendants as to Plaintiff's TVPA cause of action, then the Court may exercise pendent personal jurisdiction over the state tort causes of action because they "arise[] out of a common nucleus of operative facts with a claim in the same suit over which the [C]ourt does have personal jurisdiction."  *CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004) (quoting *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004)).

[6] This test is sometimes referred to as the *Calder*-effects test as it originates from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).  *See Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010).

-12-

defendant's "express aim was local," however, the fact that his acts harmed the plaintiff in the forum state, even if the defendant knew that the plaintiff lived there, is insufficient to satisfy the effects test. *Id.* (internal quotation marks omitted) (quoting *Schwarzenegger*, 374 F.3d at 807).

Plaintiff identifies several reasons why Defendants purposefully directed their activities at the United States. First, he asserts that Defendants abducted, detained, and tortured him to disrupt the relationship between United States companies and ITC, Plaintiff's employer. According to Plaintiff, Defendants effectuated the abduction to prevent American companies such as Beech Aircraft Corporation, ITT, Raytheon, General Dynamics, and Bell Helicopters from securing business contacts in the UAE so that Defendants' own clients, based in France, the United Kingdom, and Italy, could win such contracts. Plaintiff believes that Defendants specifically targeted him because of his close relationship with American defense contractors. (*See* K. Hassen Decl. ¶¶ 4-9.) Plaintiff argues that Defendants' conduct "was directed to the United States and would have a clear economic impact in the United States." (Opp'n at 9.)

Plaintiff also asserts that Defendants abducted him, in part, because they believed that he had an association with the CIA and thereby served as a United States government operative. While Defendants held him in captivity, Plaintiff alleges, their agents demanded that he turn over a list of all CIA operatives in the UAE. (K. Hassen Decl. ¶ 9.) Plaintiff argues that Defendants intended to acquire secrets of the United States government, which would have had a profound impact on national security. (Opp'n at 10.)

In addition, Plaintiff alleges that Defendants repeatedly and knowingly misrepresented to the United States government, including the United States Consul and State Department, that Plaintiff's whereabouts were unknown and that Plaintiff was not in the custody of UAE agents. (K. Hassen Decl. ¶ 14; N. Hassen Decl. ¶ 9; Pl.'s RJN

Exs. 1-9.)[7]  When the United States government eventually ascertained that Plaintiff was being held in the UAE, Defendants allegedly defied demands by Congressman Esteban Torres and the State Department to gain access to Plaintiff.  (K. Hassen Decl. ¶¶ 13, 16, Ex. 2; N. Hassen Decl. ¶ 10; Pl.'s RJN Exs. 1-9.)  Plaintiff also states that Defendants directed him to conceal the facts about his torture from United States consular official Carol Millikan before allowing Plaintiff to meet with her.  Defendants allegedly told Plaintiff that if he made any disclosure about his torture, he would be "dragged out to the desert and shot dead" and that Defendants would lie to the United States government by saying that Plaintiff had escaped.  Defendants also allegedly told Plaintiff that if he "did not cooperate," his wife and children, then living in the United States, "would be history."  (K. Hassen Decl. ¶ 16.)  Plaintiff contends that Defendants' efforts to deceive the United States government were aimed at the United States.  (Opp'n at 10.)

Finally, Plaintiff asserts that Defendants' alleged conduct harmed his family.  Plaintiff maintains that Defendants threatened his family with violence, causing them to return to the United States from the UAE (N. Hassen Decl. ¶¶ 4, 6), and that, once they had returned, Defendants further threatened them to prevent Plaintiff's wife from seeking the help of the United States government (*id.* ¶ 7).  After Plaintiff's release, Defendants allegedly threatened to "hunt down and murder" his family if he disclosed the events surrounding his torture.  (K. Hassen Decl. ¶ 20.)  Plaintiff's wife claims to have endured great distress over 22 months not knowing whether Plaintiff was being tortured or if he was even alive.  (N. Hassen Decl. ¶ 9.)

---

[7] Defendants object to the exhibits in Plaintiff's Request for Judicial Notice.  While the Court does not take judicial notice of Plaintiff's exhibits, the Court does cite to some of them as evidentiary support for Plaintiff's factual allegations regarding personal jurisdiction and the other procedural grounds that Defendants assert for dismissal.  Defendants, in fact, relied on some of these exhibits during oral argument.  As set forth, *supra*, a court must construe evidentiary materials submitted on a motion to dismiss for lack of personal jurisdiction in the light most favorable to the plaintiff, resolving all doubts in his favor.  *Ochoa*, 287 F.3d at 1187; *see also Mwani v. bin Laden*, 417 F.3d 1, 12 (D.C. Cir. 2005) ("[T]he district court's emphasis on satisfying strict evidentiary standards at this stage of the litigation was incorrect.").  For this reason, Defendants' evidentiary objections are OVERRULED.

### a.  Intentional Act

Plaintiff easily satisfies the intentional act element.  The Ninth Circuit "construes 'intent' as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act."  *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (brackets, ellipsis, and internal quotation marks omitted).  Here, Plaintiff alleges that both Defendants Sheikh Mohamed and General Saeed Hilal committed or directed torturous acts against him for nearly two years, lied to United States officials about their actions, and made threats to and against Plaintiff's wife and family.  These allegations suffice to establish that Defendants performed actual, physical acts.

### b.  Express Aiming

Defendants focus their argument on the second element of the effects test, contending that Plaintiff fails to show that they expressly aimed their conduct at the United States.  Relying on an out-of-circuit unpublished district court case, *Nabulsi v. Nahyan*, No. H-06-2683, 2009 WL 1658017 (S.D. Tex. June 12, 2009), Defendants argue that torturous acts abroad against an American citizen are insufficient to support the exercise of specific personal jurisdiction. (Reply at 4-6.)  This is true.  The Ninth Circuit requires "something more" than a mere "passive" connection to the forum such as citizenship:  there must be "conduct directly targeting the forum," *Brayton Purcell*, 606 F.3d at 1129, or targeting "a plaintiff whom the defendant knows to be a resident of the forum state," *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (finding specific jurisdiction where a nonresident defendant sent a letter to a nonresident third party that it knew would have an effect on the resident plaintiff).

Here, Plaintiff states that both before and after his abduction and captivity he was a resident of West Covina, California.  Plaintiff, his wife, and several of his children graduated from California State Polytechnic University in Pomona, California.  (K. Hassen Decl. ¶ 2.)  In 1970, Plaintiff and his wife married in Las Vegas, Nevada.  (*Id.* ¶ 3.)  According to Plaintiff, Defendants warned Plaintiff that they could reach him "even

in America" and knew that after they released him, Plaintiff "was returning to [his] home in West Covina." (*Id.* ¶¶ 19, 21.)

Plaintiff's allegations establish for the purposes of Defendants' Motion that Defendants directly targeted him knowing that he was a United States resident. Plaintiff thus meets the express aiming element.

*Nabulsi* is not to the contrary. In fact, *Nabulsi* recognized that "[i]n some circumstances tortious and torturous acts that occur overseas can constitute sufficient contact with the United States for due process purposes." 2009 WL 1658017, at *16. The court ultimately held that "tortious acts against an American citizen that occurs [sic] abroad *that have no further connection with the United States* cannot support the exercise of specific personal jurisdiction over a defendant." *Id.* (emphasis added); *accord Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 72 (D.D.C. 2007) ("[A]n act of torture against an American that occurs abroad and *has no further connection with the United States* cannot support the exercise of specific personal jurisdiction over a defendant." (emphasis added)).

*Nabulsi* reached its holding based on *dicta* in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002). In *Price*, the defendant, Libya, argued that the Fifth Amendment's Due Process Clause prohibited an American court from exercising personal jurisdiction over it based solely on "the alleged fact that it tortured two American citizens in Libya." 294 F.3d at 95. The District of Columbia Circuit disagreed with Libya's premise—that the Fifth Amendment applied to it, a sovereign nation—and so held. *Id.* at 96. In *dicta*, however, *Price* suggested that the torture of Americans overseas without more would not satisfy the minimum contacts requirement. *See id.* at 94 ("[T]he mere fact that the harm caused by the defendant was primarily felt in the forum because the plaintiff resided there is not enough.") (construing *Wallace v. Herron*, 778 F.2d 391, 394-95 (7th Cir. 1985)).

It may be that *Price* viewed American citizenship an insufficient connection to the United States if it assumed that the plaintiffs were not United States residents. The

plaintiffs there "had been living in Libya in the employ of a Libyan company." *Id*. at 86. Or it may be that *Price* implicitly found that Libya could not have known its conduct would affect the plaintiffs in the United States.  In that context, its holding addressed foreseeability rather than express aiming.  To the extent *Price* suggests that a nonresident defendant cannot satisfy the express aiming element by directly targeting a plaintiff whom it knows to be a forum resident, however, *Price* stands in direct conflict with the Ninth Circuit authority that binds this Court.  *See Brayton Purcell LLP,* 606 F.3d at 1129; *Bancroft & Masters, Inc.*, 223 F.3d at 1087.

Regardless, the intended aim of Defendants' alleged conduct went beyond merely harming Plaintiff.  Where courts require a "further connection" to the United States beyond torture or torturous acts perpetrated upon an American citizen abroad, they have construed such a requirement broadly.  *See, e.g.*, *Mwani*, 417 F.3d at 13 (holding that defendants alleged to have orchestrated terrorist attack on the American embassy in Nairobi were subject to personal jurisdiction where they intended their acts to "cause pain and sow terror in the embassy's home country, the United States"); *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 90 (D.D.C. 2006) (finding terrorist act in Tel Aviv attributed to Hamas reasonably foreseeable to have effect on victims' relatives residing in the United States).

Here, Plaintiff's allegations suffice to show that Defendants expressly aimed their conduct at the United States.  For instance, Plaintiff claims that his abduction served to harm American companies by impeding their ability to garner business contracts in the UAE.  In addition, Plaintiff alleges that Defendants abducted him in part because they suspected that he worked for the CIA and wanted to acquire United States government secrets.  This allegation is plausible in light of Plaintiff's claim that his torturers demanded a list of CIA agents in the UAE.  Defendants' alleged attempt to obtain state secrets is conduct aimed at the United States.

-17-

1   Defendants also allegedly lied to United States officials about Plaintiff's
2   whereabouts and later impeded consular access to him.  These alleged actions were also
3   directed at the forum state.

4   Moreover, once Plaintiff's family had returned to the United States during
5   Plaintiff's captivity, Defendants allegedly called Plaintiff's wife and threatened her that
6   she would never see her husband again if she talked to anyone about his abduction.  (N.
7   Hassen Decl. ¶ 7.)  At that time, Plaintiff's wife was a forum resident and Defendants'
8   alleged conduct was directed at her.  Even a single forum state contact such as this can
9   support jurisdiction "if the cause of action arises out of that particular purposeful contact
10  of the defendant with the forum state."  *Yahoo!*, 433 F.3d at 1210 (internal quotation
11  marks, ellipsis, and brackets omitted).  Accordingly, Plaintiff satisfies the second element
12  of the effects test.

13                    **c.    Foreseeable Effects**

14  It is entirely foreseeable that Defendants' alleged acts aimed at the United States
15  would cause harm there.  Torturing someone for nearly two years knowing that the
16  person would return to his home in the United States would clearly cause that person
17  lasting emotional trauma in the United States.  Preventing American companies from
18  establishing contracts in the UAE would harm their business interests.  Finding out the
19  names of CIA operatives in the UAE would obviously have a deleterious effect on
20  national security and place the lives of United States citizens at risk.  *See Mohamed v.*
21  *Jeppesen Dataplan, Inc.*, __ F.3d __, 2010 WL 3489913, at *16 (9th Cir. Sept. 8, 2010)
22  (explaining that disclosure of "information concerning CIA clandestine intelligence
23  operations that would tend to reveal intelligence activities, sources, or methods" would
24  "seriously harm legitimate national security interests").  In addition, Plaintiff's wife, a
25  United States resident, was foreseeably harmed by the call threatening her husband's life.
26  Thus, Plaintiff satisfies the effects test and shows that Defendants purposefully directed
27  their activities at both the forum state and its residents.

28

### 2.      Forum-Related Activities

The Court next looks to whether Plaintiff's claims arise out of Defendants' alleged forum-related activities.  Here, Plaintiff's claims are intimately related to the activities at issue.  Plaintiff claims Defendants tortured him both because they wanted to impair United States companies' ability to engage in business in the UAE and because they wanted to extract government secrets from him.  In order to cover up this torture, Defendants allegedly lied to United States officials and threatened Plaintiff's wife in the United States.  Plaintiff therefore meets his burden of establishing the second personal jurisdiction prong.

### 3.      Fair Play And Substantial Justice

As Plaintiff has established the first two prongs of personal jurisdiction, Defendants have the burden of presenting a "compelling case" why it would not be reasonable to hale them into a United States court.  *Boschetto*, 539 F.3d at 1016.  Courts in the Ninth Circuit consider seven factors in assessing the reasonableness of exercising jurisdiction:  "(1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.  *Menken*, 503 F.3d at 1058.

According to Plaintiff, Defendants' interjection into United States affairs was substantial.  They allegedly kidnapped and illegally held a United States resident, requiring the intervention of the State Department, a United States Congressmember, and a United States Senator.  They allegedly attempted to wrongfully obtain state secrets involving the identity of CIA agents.  The first factor thus strongly favors Plaintiff.

Defendants argue that "[l]itigating Plaintiff's claim in [the United States] would be inefficient and unfair for Defendants, who reside in the UAE and hold extremely high governmental positions which require their presence and attention."   (Mot. at 8.)

1   Defendants, however, also argue that Plaintiff could adequately litigate in the UAE, and
2   this litigation, wherever located, will undoubtedly require Defendants' presence and
3   attention to some degree.   Moreover, "with the advances in transportation and
4   telecommunications and the increasing inter[national] practice of law, any burden is
5   substantially less than in days past." *Menken*, 503 F.3d at 1060 (internal quotation marks
6   omitted).  The second factor thus weighs only slightly in favor of Defendants.

7           Defendants do not identify any conflicts with the UAE's sovereignty by litigating
8   in the United States.   The parties agree that UAE law did not sanction Defendants'
9   alleged conduct. (Compl. ¶ 14.)  This is a private suit for civil damages.  The Court is not
10  aware of any potential conflicts with UAE sovereignty that this litigation would pose.
11  Consequently, the third factor favors Plaintiff.

12          Defendants also argue that California has little interest in providing a forum for
13  this litigation because their alleged conduct took place entirely in the UAE and no party
14  is alleged to be a California resident.   It appears that Plaintiff is in fact a California
15  resident (*see* K. Hassen Decl. ¶ 21), and he has alleged the ill effects of his UAE
16  confinement and treatment which have persisted to this day even as he is residing in
17  California.  A state "has a strong interest in protecting its residents from torts that cause
18  injury within the state, and in providing a forum for relief." *Menken*, 503 F.3d at 1060.
19  In any event, the relevant forum is the United States, and it is undisputed that Plaintiff is
20  a United States citizen and current resident.  Fed. R. Civ. P. 4(k)(2); *Pebble Beach*, *supra*,
21  453 F.3d at 1159.  Thus, the fourth factor favors Plaintiff.

22          The fifth factor, which concerns the forum's efficiency, looks primarily at the
23  place where witnesses and evidence are most likely to be located. *Menken*, 503 F.3d at
24  1060-61.  Here, there are likely to be several witnesses in the United States, including
25  Plaintiff, his wife, and State Department officials.   Other likely witnesses, including
26  Defendants and their alleged agents, reside in the UAE.  As a result, it is difficult to
27  determine which forum would have a relative efficiency advantage.  On balance then, this
28  factor is neutral.

A United States forum, particularly one in California, will provide more convenient and effective relief than one in the UAE. While "the plaintiff's convenience is not of paramount importance," *id.* at 1061, the sixth factor favors Plaintiff.

Finally, the seventh factor is the availability of an alternative forum. Defendants argue that the UAE can provide adequate relief to Plaintiff and that he need not bring his case here. They assert that in the UAE, unlike in the United States, Plaintiff can bring his claims against all Defendants because UAE law does not confer immunity on them. (Mot. at 9, 22-23.) Plaintiff contends "he would face almost certain retribution if he filed an action against the Royal Family members in the UAE." (Opp'n at 24; *see* K. Hassen Decl. ¶ 29.) In support of this contention, Plaintiff submits a copy of a State Department web page,[8] which describes the human rights situation in the UAE in 2009. According to this report, "[a]rbitrary and incommunicado detention remained a problem" in the UAE and "[t]he judiciary lacked full independence." (Pl.'s RJN, Ex. 11 at 32.)

> The constitution provides for an independent judiciary; however, in practice, court decisions remained subject to review by the political leadership. There were reports that the Directorate of State Security, the federal intelligence service, intervened in judicial affairs. The judiciary was composed largely of contracted foreign nationals potentially subject to deportation.

(*Id.*, Ex. 11 at 34.)

In light of the less-than-clear-cut separation between the political and judicial branches of the UAE government, questions raised regarding the independence of the

---

[8] Defendants object to Plaintiff's citing this web page for the truth of the matter asserted. (Defs.' Opp'n to Pl.'s RJN at 4.) Yet, elsewhere, Defendants ask the Court to accept the truth of information set forth on another State Department web page. (*See* Defs.' RJN at 2 (citing *United States v. Hassanzadeh*, 271 F.3d 574, 581 n.2 (4th Cir. 2001), for the proposition that "courts . . . have taken judicial notice of conditions documented in the U.S. State Department's Background Notes")); *see also Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of information from official government website); *Denius v. Dunlap*, 330 F.3d 919, 926 (same); *cf. Quan v. Gonzales*, 428 F.3d 883, 888 n.5 (9th Cir. 2005) (taking judicial notice of information on commercial travel guide website to establish plausibility of claim that "banks in China are typically open on Sundays.").

UAE judiciary, and considering the nature of Plaintiff's claims as well as the high political positions held by Defendants, Plaintiff has identified genuine concerns regarding his ability to receive a fair trial in the UAE.  While the Court does not imply that Defendants would personally coerce members of the judiciary in order to obtain a favorable outcome, it is conceivable that judicial officers would feel pressure to deliver verdicts favorable to Defendants.  The seventh factor thus favors Plaintiff.

Considering the seven factors together, the Court concludes that they weigh in favor of Plaintiff.  Defendants fail to present a compelling case that the Court's exercise of jurisdiction would be unreasonable or that it would not comport with fair play and substantial justice.  In sum, the Court finds that it has personal jurisdiction over both Defendant Sheikh Mohamed and Defendant General Saeed Hilal.

**D.    Service Of Process Was Adequate**

Defendants also argue that the Court lacks personal jurisdiction over them because they were improperly served.  (Mot. at 18-20.)  "A federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with [Federal Rule of Civil Procedure 4]."  *Travelers Cas. and Sur. Co. of Am. v. Brenneke*, 551 F.3d 1132, 1135 (9th Cir. 2009) (quoting *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986) (internal quotation marks omitted)).  Courts construe Rule 4 liberally to uphold service so long as the party receives sufficient notice of the complaint.  *Id.* (citing *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1404 (9th Cir. 1994)).  Actual notice or simply naming the defendant in the complaint, however, does not suffice without substantial compliance with Rule 4.  *Id.* (quoting *Benny*, 799 F.2d at 492).

Rule 4 provides that a defendant in a foreign country may be served "by other means not prohibited by international agreement, as the court orders."  Fed. R. Civ. P. 4(f)(3).  Plaintiff filed a motion for an order permitting service of process by alternative methods under Rule 4(f)(3) [Doc. #11].  In support of this motion, Plaintiff provided evidence that he had previously attempted service on Defendants by hiring a process service company that had successfully served process several times in the UAE.  The

company's process server in the UAE was unsuccessful, however, at serving Defendants. Government agents detained the process server for four days over allegations of illegal actions against a government official and the process server feared reprisals by Defendants if he continued his attempts to serve process.  (*See* Motion for Service of Process by Alternative Methods, Tucker Decl. [Doc. #11-2].)

The Court granted Plaintiff's motion [Doc. #19].  Specifically, the Court permitted Plaintiff to serve Defendants Sheikh Khalifa and Sheikh Mohamed "by either (a) personally delivering a copy of the summons and complaint to either the United Arab Emirates ambassador or military attaché to the United States; or (b) sending a copy of the summons and complaint by certified mail to either the ambassador or the military attaché."  (March 3, 2010 Order at 7.)  The Court authorized service on Defendant General Saeed Hilal "by sending him copies of the summons and complaint, utilizing a mail or courier service that provides tracking and a signed receipt, if commercially available, at all of the following organizations: (a) Elenco Emirates Group; (b) Damas, LLC; and (c) Al Ahlia General Trading."[9]  (*Id*. at 7-8.)

Defendants do not suggest that these alternative methods of service contravened any international agreement.  To the contrary, Defendants assert that "[t]he UAE is not a signatory to the Hague Convention, or to any other agreement regarding the service of UAE citizens."  (Mot. at 18; *see* Ahnish Decl. ¶ 96.)  Defendants also do not argue that Plaintiff failed to comply with the Court's Order in effecting service of process on them, and Plaintiff presents evidence that he did in fact serve Defendants as the Court ordered. (*See* Goldberg Decl. ¶¶ 3-8, Exs. 1-3; Gonzalez Decl. ¶¶ 3-5.)

Instead, Defendants argue that service, while facially compliant with Rule 4(f)(3), was nonetheless defective "because Plaintiff did not establish that the Court could exercise personal jurisdiction over Defendants, a prerequisite to proper service under

---

[9] Plaintiff provided evidence that Defendant General Saeed Hilal is the chairman of the board and chief executive of Elenco Emirates Group, serves on the executive committee of Damas, LLC, and is a major shareholder of Al Ahlia Group, which includes Al Ahlia General Trading.

Rule 4(f)(3)."  (Mot. at 19 (citing *Nabulsi*, 2009 WL 1658017, at *11).)  As discussed *supra*, however, Plaintiff has established this Court's personal jurisdiction over Defendants.  *Nabulsi* involved a situation where the court lacked personal jurisdiction over the defendants and is thus inapposite.

Defendants were properly served under Rule 4(f)(3) and have actual notice of this lawsuit.  Due process requires nothing more.[10]

## IV.

## STATUTE OF LIMITATIONS

Defendants contend that the statute of limitations bars Plaintiff's claims and that Plaintiff is not entitled to equitable tolling.  (Mot. at 13-16.)  The TVPA provides for a 10-year statute of limitations.  *See* 28 U.S.C. § 1350, historical and statutory notes, Torture Victim Protection, § 2(c); *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1229 (9th Cir. 2007).[11]  California's statute of limitations for assault, battery, and other personal injury

---

[10] Defendants also argue that service was ineffective under Rule 4(f)(2) because it did not comport with UAE law.  Defendants claim that service violated UAE law, in part, because Plaintiff did not translate the Summons and Complaint into Arabic.  (Mot. at 19.)  Although this argument misses its mark insofar as Plaintiff did not serve Defendants under Rule 4(f)(2) and the legality of service under foreign law is immaterial to service under Rule 4(f)(3), *see Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002) ("[A]s long as court-directed and not prohibited by an international agreement, service of process ordered under Rule 4(f)(3) may be accomplished in contravention of the laws of the foreign country."), in retrospect the Court agrees that including a translated copy would have been preferable.  If Defendants feel prejudiced by the omission of an Arabic-language copy of the Summons and Complaint, they may request that the Court order Plaintiff to serve one or request that Plaintiff provide one voluntarily.

[11] Although the TVPA was enacted in 1991, after the events at issue, the Court assumes that the statute applies retroactively as Defendants do not argue otherwise and the weight of authority supports that interpretation.  *See Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1153-54 (11th Cir. 2005) (holding TVPA applies retroactively); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1195-96 (S.D.N.Y. 1996) (same); *Xuncax v. Gramajo*, 886 F. Supp. 162, 176-77 (D. Mass. 1995) (same); *Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009) (applying TVPA retroactively *sub silentio*); *Lizarbe v. Rondon*, 642 F. Supp. 2d 473 (D. Md. 2009) (same).  *But see Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.").  In a 1996 case, the Ninth Circuit held that the TVPA is retroactive, *Alvarez-Machain v. United States*, 107 F.3d 696, 702-03 (9th Cir. 1996), but later vacated its decision for unrelated reasons, *see Marley v. United States*, 567

1    claims—including intentional infliction of emotional distress—is currently two years.[12]

2    *See* Cal. Civ. Proc. Code § 335.1; *Canatella v. Van De Kamp*, 486 F.3d 1128, 1132 (9th

3    Cir. 2007); *McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal. 4th 88, 107 & n.5, 84

4    Cal. Rptr. 3d 734 (2008) (citing *Marcario v. County of Orange*, 155 Cal. App. 4th 397,

5    65 Cal. Rptr. 3d 903 (2007)).   An action for false imprisonment has a one-year limitations

6    period.   *See* Cal. Civ. Proc. Code § 340(c).   When the alleged acts involve a civil

7    conspiracy,[13] the limitations period runs from the date of the last overt act in furtherance

8    of the conspiracy.   *See Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992

9    (9th Cir. 2006).

10          Here, the last overt act allegedly occurred on November 4, 1985 when a UAE

11   security officer threatened Plaintiff as the officer escorted Plaintiff from the jail to his

12   flight back to the United States.   (K. Hassen Decl. ¶¶ 3, 20.)   Thus, the limitations period

13   for each of Plaintiff's causes of action had expired when he filed the instant action on

14   February 13, 2009.   As Plaintiff concedes, his lawsuit is timely only if he is entitled to

15   have the limitations periods tolled.

16          The TVPA's limitations period is subject to equitable tolling, "including for

17   periods in which the defendant is absent from the jurisdiction or immune from lawsuits

18   and for periods in which the plaintiff is imprisoned or incapacitated."   *Hilao v. Estate of*

19   *Marcos*, 103 F.3d 767, 773 (9th Cir. 1996) (citing S. Rep. No. 102-249, at 11 (1991)).

20

21   ─────────────────────────

22   F.3d 1030, 1037-38 (9th Cir. 2009) (explaining *Alvarez-Machain*'s tortuous procedural history and lack of precedential value), *cert. denied*, 130 S.Ct. 796, and has not revisited the issue.

23      [12] As Defendants point out, the limitations period at the time Plaintiff's claims accrued was one

24   year.   *See Krupnick v. Duke Energy Morro Bay, L.L.C.*, 115 Cal. App. 4th 1026, 1028, 9 Cal. Rptr. 3d

25   767 (2004) (noting that the two-year limitations period became effective on January 1, 2003). Regardless of which limitations period the Court applies, Plaintiff did not file his lawsuit within the statutory period.

26      [13] Conspiracy is not an independent cause of action, but rather a legal doctrine that imposes

27   liability on those who, though not actually committing a tort themselves, "share with the immediate tortfeasors a common plan or design in its perpetration."   *Applied Equip. Corp. v. Litton Saudi Arabia*

28   *Ltd.*, 7 Cal. 4th 503, 510-11, 28 Cal. Rptr. 2d 475 (1994).

The parties agree that equitable tolling is appropriate when a plaintiff adequately alleges that either "(1) [the] defendant's wrongful conduct prevented [the] plaintiff from asserting the claim; or (2) extraordinary circumstances outside the plaintiff's control made it impossible to timely assert the claim," *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1146 (E.D. Cal. 2004).  (Opp'n at 15; Reply at 9.)  The equitable tolling analysis is the same for Plaintiff's tort claims under state law.  *See Deutsch v. Turner Corp.*, 324 F.3d 692, 718 (9th Cir. 2003) (finding that district court's reasoning regarding equitable tolling under federal statute adopting the TVPA's 10-year limitations period "applies equally to the state law claims").

Plaintiff asserts that he is entitled to equitable tolling due to his reasonable fear for both his own and his family's safety if he were to file a lawsuit against Defendants. While Plaintiff was in captivity, Defendants allegedly told him in no uncertain terms that they would kill him and his family if he discussed his torture after being released.  (K. Hassen Decl. ¶¶ 16, 19, 20.)  Upon Plaintiff's return to the United States, he "lived in fear of [his] life" on a daily basis.  (*Id*. ¶ 22.)  Plaintiff installed an electronic gate and four security cameras, purchased a mobile phone for his car,[14] obtained watch dogs, and hired a security guard.  He had constant nightmares involving Defendants.  (*Id*.)

Following the September 11, 2001 terrorist attacks against the United States, the United States government began to institute intensive domestic security measures.  In addition, the government began to closely monitor travelers from the UAE—in part, Plaintiff asserts, because several of the individuals who hijacked airplanes originally came from the UAE and had UAE passports.  (*Id*. ¶ 23.)  As a result of the heightened security measures instituted by the United States and, in particular, the "charged political environment against external terrorist threats from the Middle East," Plaintiff grew less fearful of Defendants.  (*Id*. ¶ 24.)  Although Defendants had achieved higher office in the

---

[14] Mobile phones, the Court notes, were not the commonplace consumer accessory in 1985 that they are today.

UAE since the time of Plaintiff's detention, Plaintiff began to believe that they would not send an agent to harm an American citizen on American soil in light of the enhanced security measures and powerful response by the United States against perpetrators of the terrorist attacks.  (*Id*.)

Plaintiff learned that the United States government had become much better prepared to identify foreign agents, monitor their activities, and intercede to avoid harm to American citizens.  It dedicated a large number of federal agents to counterterrorism and security, created a new Department of Homeland Security, passed the USA Patriot Act into law, created a security index (the Homeland Security Advisory System), increased and coordinated surveillance at airports and other ports of entry into the country, and improved and coordinated electronic databases and intelligence gathering for security purposes through the new Terrorist Threat Integration Center.  These measures were implemented gradually following the adoption of the 9-11 Commission's recommendations.  (*Id*. ¶ 25.)  In approximately September 2005, Plaintiff came to believe that the government could protect him and his family from Defendants if he exposed their alleged acts and, as a result, began researching his claims.[15]  (*Id*. ¶ 26.)

Courts apply equitable tolling to the TVPA's limitations period when political conditions in the country at issue make meaningful access to justice impossible.

> There is good reason not to create or apply general hard and fixed rules of laches or relatively short statutes of limitation, newly minted by judicial fiat, in the developing area of international law.  In many instances a

---

[15] Defendants decry "Plaintiff's reliance on the tragic events of September 11th to justify his failure to bring suit against UAE officials" as being "disconcerting and in bad form."  (Reply at 9.) Plaintiff's argument, however, is somewhat more nuanced.  Plaintiff does not assert that the September 11, 2001 terrorist attacks "reset the clock," as Defendants characterized Plaintiff's position at oral argument.  Rather, Plaintiff argues that the security situation in the United States changed dramatically in the wake of the terrorist attacks—a point readily observable to anyone who has boarded a flight in recent years—and that this tightening of domestic security and border controls made him feel sufficiently safe from Defendants in the United States to file suit here, even before any regime change in the UAE.

foreign government, group or individuals may be involved both in the violation and in threats that make it impossible for individuals harmed to complain until there is a new administration or the plaintiff can escape to freedom in another country.

*In re Agent Orange Product Liability Litigation*, 373 F. Supp. 2d 7, 61 (E.D.N.Y. 2005), *aff'd*, 517 F.3d 104 (2d Cir. 2008), *cert. denied*, 129 S.Ct. 1524, 173 L.Ed.2d 667 (2009).

In *Saravia*, for instance, the court granted equitable tolling due to the civil war and its aftermath in El Salvador. The plaintiff had anonymously filed suit against a former paramilitary leader's chief of security who had carried out politically-motivated assassinations and other human rights abuses. The court found that "any person who leveled allegations against active or former members of the military risked reprisal, including death" and that the plaintiff's "fear of violent reprisals" made it impossible for him or her to seek justice in either a United States or Salvadoran court. 348 F. Supp. 2d at 1147. As here, there was no single event that suddenly made it possible for the plaintiff to seek justice in a United States court. Instead, the court noted, "changes in the country have now allowed plaintiff's attorneys to investigate the case and obtain the cooperation of witnesses in El Salvador." *Id.* at 1148; *see also Jean v. Dorélien*, 431 F.3d 776, 781 (11th Cir. 2005) ("The pattern and practice of torture, mass murder, intimidation and reprisals against perceived opponents of the government during the military regime in Haiti from 1991 to 1994 as alleged in [the] complaint clearly qualify as extraordinary circumstances to toll the statute of limitations until [the defendant] was removed from his position, the repressive security forces were dismantled and the democratically elected government resumed power.").

In *Forti v. Suarez-Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987), a pre-TVPA case, two Argentine citizens brought claims against a former Argentine general for crimes, including torture, murder, and prolonged arbitrary detention, committed during Argentina's "dirty war" against suspected subversives during the mid- to late 1970s. Like Defendants here, the *Forti* defendant argued that the plaintiff was not denied access

1   to the foreign courts and could have filed suit earlier.  The court rejected this argument

2   and found that the plaintiffs might be able to demonstrate equitable tolling:

> Nominally, the Argentine courts retained their powers to adjudicate civil
> claims against military officers and to grant habeas relief.  As a practical
> matter, however, access to Argentine courts may have been denied to
> plaintiffs.  Plaintiffs present facts indicating that the court retained . . . its
> powers over the military in form only and that effectively, no relief was or
> could be granted by the Argentine courts.   Additionally, given the
> pervasiveness of the military's reign of terror, it may be possible for
> plaintiffs to demonstrate that members of the judiciary neglected to apply
> laws granting relief out of fear of becoming the next victim of the "dirty
> war."   At this stage of the litigation the Court cannot rule that plaintiffs will
> be unable to prove that they were denied effective access to the Argentine
> courts [before the democratically-elected government assumed power].

15  672 F. Supp. at 1550; *see also Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 482 (D. Md.

16  2009) (applying equitable tolling while "the political climate in Peru was unremittingly

17  hostile to any effort on [the plaintiffs'] part to pursue remedies against [the defendant] in

18  Peru").

19      Congress intended courts to apply equitable tolling to TVPA claims broadly to

20  ensure that torture victims have an opportunity to vindicate their rights.  *See* S. Rep. No.

21  102-249, at 10-11 ("The legislation provides for a 10-year statute of limitations, but

22  explicitly calls for consideration of all equitable tolling principles in calculating this

23  period with a view toward giving justice to plaintiff's rights.").  As one court explained,

24  "[t]he remedial scheme conceived by the TVPA . . . would fail if courts allowed the clock

25  to run on potentially meritorious claims while the *regime responsible* for the heinous acts

26  for which these statutes provide redress remains in power, frightening those who may

27  wish to come forward from ever telling their stories."   *In re S. African Apartheid Litig.*,

28  617 F. Supp. 2d 228, 289 (S.D.N.Y. 2009) (emphasis in original); *see also Chavez v.*

-29-

*Carranza*, 559 F.3d 486, 493 (6th Cir.) ("[W]here plaintiffs legitimately fear reprisals against themselves or family members from the regime in power, justice may require tolling."), *cert. denied*, 130 S.Ct. 110, 175 L.Ed.2d 32 (2009).

As a consequence of the Congressional intent to preserve torture victims' remedies, courts frequently apply equitable tolling for periods of a decade or more. *See, e.g.*, *Chavez*, 559 F.3d at 494 (affirming equitable tolling for more than 13 years); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154-55 (11th Cir. 2005) (tolling TVPA claim for 17 years while the Chilean military regime, which had prevented the plaintiffs from pursuing their claims, remained in power); *Lizarbe*, 642 F. Supp. 2d at 482 (tolling TVPA claim for at least 15 years); *Saravia*, 348 F. Supp. 2d at 1148 (tolling TVPA claim for 23 years).

Plaintiff has presented sufficient evidence to create a triable issue of fact whether he reasonably feared reprisal by Defendants if he brought this lawsuit earlier, such that equitable tolling may be appropriate up to the date that Plaintiff filed this action. Drawing all inferences in favor of Plaintiff, the allegations and supporting documentation suggest that Defendants threatened Plaintiff and his family, both during his captivity and afterward, such that it was impossible for Plaintiff to file suit in either the UAE or, until at least 2005, the United States. Thus, the Court cannot dismiss Plaintiff's claims as time-barred at this stage of the litigation.

## V.

## **EXHAUSTION**

Defendants also argue that Plaintiff has failed to exhaust his remedies in the UAE with respect to his cause of action under the TVPA. (Mot. at 16-17.) The TVPA contains an express exhaustion requirement. *See* 28 U.S.C. § 1350, historical and statutory notes, Torture Victim Protection, § 2(b) ("A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."); *Sarei*, 487 F.3d at 1216. Congress included the exhaustion requirement to promote comity, avoid

1    unnecessary burdens on American courts, and encourage the development of foreign
2    legal systems.  *See* H.R. Rep. No. 102-367, at 5.

3          In interpreting how the TVPA's exhaustion provision operates, the Ninth Circuit
4    has followed the Senate Report due to its "remarkable clarity":

5          [T]orture victims bring suits in the United States against their alleged
6          torturers only as a last resort. . . .  Therefore, as a general matter, the
7          committee recognizes that in most instances the initiation of litigation under
8          this legislation will be virtually prima facie evidence that the claimant has
9          exhausted his or her remedies in the jurisdiction in which the torture
10         occurred.  The committee believes that courts should approach cases brought
11         under the proposed legislation with this assumption.

12         More specifically, . . . the interpretation of section 2(b) should be
13         informed by general principles of international law.  The procedural practice
14         of international human rights tribunals generally holds that the respondent
15         has the burden of raising the nonexhaustion of remedies as an affirmative
16         defense and must show that domestic remedies exist that the claimant did
17         not use.  Once the defendant makes a showing of remedies abroad which
18         have not been exhausted, the burden shifts to the plaintiff to rebut by
19         showing that the local remedies were ineffective, unobtainable, unduly
20         prolonged, inadequate, or obviously futile.  The ultimate burden of proof and
21         persuasion on the issue of exhaustion of remedies, however, lies with the
22         defendant.

23   *Hilao*, 103 F.3d at 778 n.5 (quoting S. Rep. 102-249, at 9-10); *see also Jean*, 431 F.3d at
24   781 ("[T]he exhaustion requirement pursuant to the TVPA is an affirmative defense,
25   requiring the defendant to bear the burden of proof.  This burden of proof is substantial."
26   (citations and footnote omitted)).

27         Defendants contend that Plaintiff could have brought suit against Defendants in the
28   UAE but chose not to do so.  (Mot. at 16-17.)  Defendants submit the declaration of Dr.

Faraj Abdullah Ahnish, a legal expert, who opines that "UAE civil courts have jurisdiction to entertain and adjudicate civil suits based on the causes of action pleaded by [Plaintiff] and to award adequate monetary relief and damages, if [Plaintiff] is able to prove his case on a balance of probabilities or preponderance of evidence (which is the standard of proof in civil cases)." (Ahnish Decl. ¶ 25.) Dr. Ahnish further asserts that had Plaintiff brought his causes of action against Defendants in the Emirate of Abu Dhabi, Defendants would not be entitled to immunity and "all the provisions of UAE law (civil and criminal) would be applicable against them."[16] (Id. ¶ 103.) Dr. Ahnish attaches to his declaration a list of twelve cases litigated in UAE courts that he claims resulted in decisions unfavorable to members of the Al Nahyan family. (Id., Annexure 1.)

Dr. Ahnish's declaration fails to address the problems with litigating in the UAE that Plaintiff identifies. Plaintiff does not dispute that the UAE law nominally provides a means of suing Defendants. Plaintiff asserts that a lawsuit would be ineffective, inadequate, or obviously futile given the nature of the charges and Defendants' enormous political power. Plaintiff alleges that a person in the UAE cannot criticize members of the royal family in public or in print (K. Hassen Decl. ¶ 29; see Pl.'s RJN, Ex. 11 at 36 ("The constitution provides for freedom of speech and of the press; however, the government restricted these rights in practice. The law prohibits criticism of rulers . . . .")),[17] an allegation which, if true, would make it very difficult to prosecute members of the royal family for torture. Dr. Ahnish attempts to illustrate judicial independence by explaining that judges are difficult to remove. (Ahnish Decl. ¶¶ 21-24.) He does not address, however, the problem identified by Plaintiff that most UAE judges

---

[16] In the Emirate of Dubai, however, "claims against the Ruler of Dubai might not be entertained by the competent court without obtaining the approval of the Ruler." In addition, "claims against the Government of Dubai" require adherence to "certain formalities" prior to filing suit. (Ahnish Decl. ¶ 101.)

[17] The version provided by Plaintiff cuts off words in the margin. The Court quotes directly from the State Department website, http://www.state.gov/g/drl/rls/hrrpt/2009/nea/136082.htm.

1    are from overseas and thus subject to effective removal from office via deportation. (*See*
2    Pl.'s RJN, Ex. 11 at 34.)   Furthermore, in the list of cases that Dr. Ahnish attaches
3    purporting to show successful litigation against the royal family, not one involves a
4    defendant in the instant litigation.   As Plaintiff argued at the hearing, the royal family is
5    large and not monolithic—some members can fall into disfavor.   Indeed, one of the
6    reasons Plaintiff alleges that Defendants abducted him was because a conflict arose
7    between his employer, a member of the Abu Dhabi royal family, and Defendants Sheikh
8    Khalifa and Sheikh Mohamed's father. (K. Hassen Decl. ¶¶ 4-5.)   Plaintiff's employer,
9    also a member of the royal family, obviously did not have the power to prevent his
10   alleged confinement and torture.   It is thus not surprising that litigation might be
11   successful against certain disfavored members of the royal family.

12          Moreover, it appears that most if not all of the cases that Dr. Ahnish cites pertain to
13   business or contractual disputes.   Defendants identify no cases in which a plaintiff
14   successfully sued a prominent member of the royal family for torture, assault, battery,
15   false arrest, false imprisonment, or intentional infliction of emotional distress—the
16   conduct alleged here.   Plaintiff, however, highlights a case from this year in which a UAE
17   court acquitted a member of the royal family of torture charges—notwithstanding a three-
18   hour video tape depicting the defendant "beating the [victim] with a nail board, burning
19   his genitals with a cigarette lighter, shocking him with a cattle prod and pouring salt into
20   his wounds as a security guard looked on." (Pl.'s RJN, Ex. 12 at 47-48.)   According to
21   the defendant's attorney, the court acquitted him because he had been given medication
22   that diminished his responsibility for his acts and the torture was recorded with
23   extortionist intent. (*Id.* at 48.)   While the Court acknowledges the limits of extrapolation
24   from a single case, this evidence supports Plaintiff's belief that he could not obtain a fair
25   trial in the UAE.[18]

26

27          _____
28          [18] The Court notes again the difficulties that Plaintiff encountered simply in attempting to
     personally serve Defendants in this action.   Government agents detained the process server for four days

-33-

In sum, Defendants fail to rebut Plaintiff's showing that his remedies in the UAE were ineffective, unobtainable, inadequate, and obviously futile.   Plaintiff presents evidence that the judiciary lacks independence from the government, and that Defendants' positions of great power would make a fair trial unattainable in the UAE. Dismissal of this suit on exhaustion grounds is therefore inappropriate.

## VI.

### FORUM NON CONVENIENS

Defendants also ask the Court to dismiss this action under the doctrine of *forum non conveniens*.  (Mot. at 21-25.)   The decision to dismiss an action on *forum non conveniens* grounds depends on whether (1) "an adequate alternative forum exists"; and (2) "the balance of private and public interest factors favors dismissal."  *Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 693 (9th Cir. 2009) (quoting *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001)) (internal quotation marks omitted).[19]   Courts afford "great deference" to plaintiffs suing in their home forum because the convenience to them "will usually outweigh the inconvenience the defendant may have shown."  *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 664 (9th Cir. 2009) (quoting *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 767 (9th Cir. 1991)) (internal quotation marks omitted), *petition for cert. filed*, No. 10-274 (June 21, 2010).

---

leaving him fearful of reprisals.  (*See* Motion for Service of Process by Alternative Methods, Tucker Decl. ¶ 7.  [Doc. # 11-2])

[19]   The private factors are "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Boston Telecomms. Group, Inc. v. Wood*, 588 F.3d 1201, 1206-07 (9th Cir. 2009) (quoting *Lueck*, 236 F.3d at 1145).  The public factors are "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum."  *Id.* at 1211 (quoting *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1181 (9th Cir. 2006)) (internal quotation marks omitted).

-34-

1    The defendant bears the burden of demonstrating both the existence and adequacy
2    of an alternative forum. *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1178 (9th
3    Cir. 2006). "Dismissal is not appropriate 'where the alternative forum does not permit
4    litigation of the subject matter of the dispute,' such that 'the remedy provided by the
5    alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all.'"
6    *Lockman*, 930 F.2d at 768 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 &
7    n.22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)).

8    As discussed, *supra*, Defendants have not shown that the UAE is an adequate
9    alternative forum insofar as it appears unlikely that Plaintiff could receive a fair or even a
10   safe trial there.   Consequently, dismissal on *forum non conveniens* grounds is
11   inappropriate.   *See, e.g.*, *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 29 (D.D.C.
12   2005) (finding that "genuine risk of reprisals" if the plaintiffs attempted to litigate in the
13   foreign venue precluded *forum non conveniens* dismissal), *appeal dismissed*, 473 F.3d
14   345 (D.C. Cir. 2007), *cert. denied*, 128 S.Ct. 2931, 171 L.Ed.2d 876 (2008); *Rasoulzadeh*
15   *v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y. 1983) (denying motion to dismiss
16   for *forum non conveniens* notwithstanding "important evidence . . . located in Iran"
17   because litigation in Iran posed considerable risk to plaintiffs' safety), *aff'd mem.*, 767
18   F.2d 908 (2d Cir. 1985).   In any event, the private factors are, at best, near equipoise
19   between litigating this action here and in the UAE given that the parties, witnesses, and
20   evidence are located in both countries, whereas the public factors favor litigation in the
21   United States given the "strong public interest in favoring the receptivity of United States
22   courts to [TVPA] claims." *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d
23   1283, 1299 (11th Cir. 2009) (internal quotation marks omitted); *see also* S. Rep. 102-249,
24   at 3-4 ("Judicial protection against flagrant human rights violations is often least effective
25   in those countries where such abuses are most prevalent. . . .   Consequently, the [TVPA]
26   is designed to respond to this situation by providing a civil cause of action in U.S. courts
27   for torture committed abroad.").   The Court therefore denies Defendants' motion to
28   dismiss the action based upon *forum non conveniens* grounds.

# VII.

## ACT OF STATE DOCTRINE

Lastly, Defendants argue that the act of state doctrine bars Plaintiff's claims.  (Mot. at 20-21.)  The act of state doctrine prevents United States courts from inquiring into the validity of a recognized sovereign power's public acts committed within its own territory. *Sarei*, 487 F.3d at 1208 (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Timberlane Lumber Co. v. Bank of Am.*, 549 F.2d 597, 605-07 (9th Cir. 1977)).  The doctrine arises from the domestic separation of powers in that the judiciary, by passing on the validity of foreign acts, may hinder the executive branch's conduct of foreign affairs.  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990).  The act of state doctrine may bar an action where "(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed in the action would require a court in the United States to declare invalid the foreign sovereign's official act." *Sarei*, 487 F.3d at 1208 (quoting *W.S. Kirkpatrick & Co.*, 493 U.S. at 405) (internal quotation marks and brackets omitted).[20]

Defendants' argument falls of its own weight.  This lawsuit does not concern any official act by the UAE.  "[A]ll states believe torture is wrong, [and] all that engage in torture deny it . . . ."  *In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d

---

[20] Even if a lawsuit would call into question the validity of a foreign sovereign's act within its own territory, "the policies underlying the act of state doctrine may not justify its application."  *W.S. Kirkpatrick & Co.*, 493 U.S. at 409.

> [1][T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it . . . .  [2][T]he less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches.  [3]The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence.

*Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1089 (9th Cir. 2009) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)) (brackets in *Placer Dome*), *petition for cert. filed*, 130 S.Ct. 2139, 176 L.Ed.2d 719 (2010).

-36-

493, 500 (9th Cir. 1992) (internal quotation marks and brackets omitted) (quoting *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992)). Defendants' own evidence shows that Plaintiff's causes of action "amount to criminal offen[s]es under UAE law." (Ahnish Decl. ¶ 26.) This lawsuit concerns private acts allegedly committed by UAE officials. Although Defendants argue that allowing this lawsuit to proceed will affect foreign relations between the United States and the UAE due to Defendants' positions within the UAE government, this is really an argument for head-of-state immunity. *See Samantar*, 130 S.Ct. at 2290-91 (recognizing that "the act of state doctrine is distinct from immunity" and that the act of state doctrine can apply to an individual official's acts only when the "official's acts can be considered the acts of the foreign state"). The Court has already addressed Defendants' immunity argument, *supra*. The act of state doctrine is not implicated.

## VIII.
## CONCLUSION

In light of the foregoing:

1. The Motion to Dismiss is GRANTED as to Defendant Sheikh Khalifa, who is dismissed without prejudice; and

2. The Motion to Dismiss is DENIED as to Defendants Sheikh Mohamed and General Saeed Hilal.

**IT IS SO ORDERED.**

DATED: September 17, 2010

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

-37-